DEBORA K. KRISTENSEN
JACQUELINE M. FEARNSIDE
GIVENS PURSLEY LLP
277 North Sixth Street, Suite 200
P.O. Box 2720
Boise, Idaho 83701-2720
Telephone: 208-388-1200
Facsimile: 208-388-1300
Debora K. Kristensen Idaho State Bar ID# 5337
Jacqueline M. Fearnside Idaho State Bar ID# 5681
S:\Clients\5624\1\Pld\Memo in Support of Motion for Summary Judgment2.doc

Attorneys for Defendant
GANNETT CO., INC.



# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUDITH E. WORRELL-PAYNE,<br><br>          Plaintiff,<br><br>vs.<br><br>GANNETT CO, INC., a Delaware corporation,<br>d/b/a *The Idaho Statesman*,<br><br>          Defendant. | Case No. 98-0228-S-EJL<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |



# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................1

II. PRELIMINARY STATEMENT .........................................................................................1

III. ARGUMENT......................................................................................................................2

    A. *Worrell-Payne has failed to adduce clear and convincing evidence of actual malice,*
    *as a public official or public figure must in lawsuits against the press* ...........................*2*

        *i.*     *Worrell-Payne is a public official*.................................................................*3*

        *ii.*    *Worrell-Payne is also a public figure in this action* ......................................*5*

        *iii.*  *Worrell-Payne cannot demonstrate, with "convincing clarity," that the*
             *Statesman acted with actual malice*..............................................................*6*

    B. *The "fair report privilege" also bars Worrell-Payne's claims* .........................................*8*

    C. *Worrell-Payne has not met her burden of demonstrating the publication of a*
    *provably false statement of fact*.......................................................................................*10*

        *i.*     *Falsity is the plaintiff's burden in cases like this one* ..................................*10*

        *ii.*    *Worrell-Payne has pointed to no false facts in the Statesman's*
              *publications* ..................................................................................................*11*

        *iii.*  *The remaining statements of which Worrell-Payne complains are not*
              *verifiable statements of fact and/or are otherwise non-actionable*
              *opinion*..........................................................................................................*14*

        *iv.*   *Worrell-Payne's "implied defamation" claim cannot sidestep the*
              *Statesman's protections for publishing substantially true information or*
              *non-actionable opinion* .................................................................................*16*

    D. *Worrell-Payne's other claims all must fail for the same reasons as her libel action* .....*22*

    E. *Worrell-Payne has come forward with no evidence of any damages, and as a matter*
    *of law, she is not entitled to punitive damages*................................................................*27*

IV. CONCLUSION .................................................................................................................*29*

# TABLE OF AUTHORITIES

**Cases:**

*Andrews v. Stallings*, 892 P.2d 611 (N.M. Ct.App. 1995) .................................................................10

*Baker v. Burlington Northern, Inc.*, 99 Idaho 688, 587 P.2d 829 (1978).....................................11, 24

*Bandelin v. Pietsch*, 98 Idaho 337, 563 P.2d 395, *cert. denied,* 434 U.S. 891 (1977)............2, 3, 5, 7

*Barger v. Playboy Enterprises*, 564 F.Supp. 1151 (N.D. Cal. 1983),
*aff'd*, 732 F.2d 163 (9th Cir.), *cert. denied,* 469 U.S. 853 (1984) .......................................................10

*Barker v. Huang*, 610 A.2d 1341 (Del. 1992)...................................................................................24

*Barlow v. International Harvester Co.*, 95 Idaho 881, 522 P.2d 1102 (1974) ...................................26

*Barter v. Wilson*, 512 N.E.2d 816 (Ill. App. 1987)...........................................................................16

*Brown v. K.N.D. Corp.*, 529 A.2d 1292 (Conn. 1987) .........................................................................4

*Brown v. Matthews Mortuary, Inc.*, 118 Idaho 830, 801 P.2d 37 (1990) ....................................25, 26

*Clawson v. Longview Publishing Co.*, 589 P.2d 1223 (Wash. 1979)....................................................4

*Conroy v. Kilzer*, 789 F. Supp. 1457 (D. Minn. 1992) ......................................................................17

*Cooper v. Rockford Newspapers, Inc.*, 365 N.E.2d 744 (Ill. App. Ct. 1977)........................................4

*Crane v. The Arizona Republic*, 972 F.2d 1511 (9th Cir. 1992) ..........................................................2

*DeMeo v. Goodall*, 640 F. Supp. 1115 (D.N.H. 1986)........................................................................24

*Diesen v. Hessburg*, 455 N.W.2d 446 (Minn. 1990) ..........................................................................17

*Dodds v. American Broadcasting Co.*, 145 F.3d 1053 (9th Cir. 1998),
*cert. denied*, 119 S.Ct. 866 (1999) ...............................................................................................18, 22

*Doe v. Cutter Biological*, 844 F.Supp. 602 (D.Idaho 1994)...............................................................28

*Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 479 (1985) .......................................................29

*Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188 (9th Cir.),
*cert. denied*, 493 U.S. 812 (1989) ....................................................................................................24

*Edwards v. National Audubon Society*, 556 F.2d 113 (2nd Cir.),
*cert. denied*, 434 U.S. 1002 (1977) ...................................................................................8

*Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162 (Tenn. 1992),
*cert. denied*, 113 S. Ct. 2931 (1993) ..................................................................................4

*Galveston Newspapers, Inc. v. Norris*, 981 S.W.2d 797 (Tex.Ct. App. 1998) ..............................5, 24

*Gertz v. Welch*, 418 U.S. 323 (1974) ......................................................................................3, 6

*Gotbetter v. Dow Jones & Co., Inc.*, 687 N.Y.S.2d 43 (N.Y. App. 1999).........................................16

*Grzelak v. Calumet Publishing Co.*, 543 F.2d 579 (7th Cir. 1975) ........................................4

*Guzzardo v. Adams*, 411 So.2d 1148 (La.App.), *cert. denied*, 415 So.2d 942 (La. 1982) .................4

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ..........................2, 6, 8

*Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980)..............................26

*Holbrook v. Chase*, 12 Media L. Rep. 1732 (4th Dist., Idaho 1985)...................................25

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ............................................................2, 23

*Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266,
824 P.2d 841 (1991) ...............................................................................................26, 27

*Idaho State Bar v. Topp*, 129 Idaho 414, 925 P.2d 1113 (1996),
*cert. denied*, 520 U.S. 1155 (1997) ................................................................... 14, 16, 19, 20

*Koch v. Goldway*, 817 F.2d 507 (9th Cir. 1987).............................................................23, 24

*Lewis v. Time, Inc.*, 710 F.2d 549 (9th Cir. 1983)................................................................18

*Maynard v. The Daily Gazette Co.*, 447 S.E.2d 293 (W.Va. 1994).................................................15

*McBride v. City of Roanoke Redevelopment and Housing Authority*,
871 F.Supp. 885 (W.D.Va.), *aff'd*, 78 F.3d 579 (4th Cir. 1994) ........................................22

*Mihalik v. Duprey*, 417 N.E.2d 1238 (Mass Ct. App. 1981).........................................................17

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)...........................................................14, 15

*New York Times v. Sullivan*, 376 U.S. 254 (1964).........................................................2, 10, 21, 30

*Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990).................................................22

*Partington v. Bugliosi*, 56 F.3d 1147 (9ᵗʰ Cir. 1995) ........................................................15

*Peterson v. Idaho First National Bank*, 83 Idaho 578, 367 P.2d 284 (1961)......................................25

*Philadelphia Newspapers v. Hepps*, 475 U.S. 767 (1986) ..................................................10

*Pierce v. Capital Cities Communication, Inc.*, 576 F.2d 495 (3ʳᵈ Cir.),
*cert. denied*, 439 U.S. 861 (1978) ........................................................17

*Pittman v. Gannett River States Publishing, Corp.*, 836 F. Supp. 377 (S.D.Miss. 1993) ...................9

*Ramsay v. Mary Imogene Bassett Hospital*, 113 A.D.2d 149 (N.Y.App. 1985) ...............................24

*Readers Digest v. Superior Court*, 37 Cal.3d 244, 208 Cal.Rptr. 137 (Cal. 1984),
*cert. denied*, 478 U.S. 1009 (1986) ........................................................24

*Roberts v. Dover*, 525 F. Supp. 987 (M.D. Tenn. 1983) ..................................................8

*Ronwin v. Shapiro*, 657 F.2d 1071 (9ᵗʰ Cir. 1981) ..................................................9

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ........................................................3, 4, 5

*Sassone v. Elder*, 626 So.2d 345 (La. 1993) ........................................................17

*Schaefer v. Lynch*, 406 So.2d 185 (La. 1981) ........................................................17

*Shipley v. Knoxville Journal Corp.*, 670 S.W.2d 222 (Tenn. Ct. App. 1984)........................................4

*Slawik v. News Journal Co.*, 428 A.2d 15 (Del. 1981)........................................................20

*Strada v. Connecticut Newspapers, Inc.*, 477 A.2d 1005 (Conn. 1984) ...............................17

*Strong v. Oklahoma Publishing Co.*, 899 P.2d 1185 (Okla. Ct. App. 1995) ...............................4

*Sullivan v. Int'l Brotherhood of Electrical Workers*, 157 F.3d 1092 (7ᵗʰ Cir. 1998) ...................16

*Time, Inc. v. Hill*, 385 U.S. 374 (1966)........................................................23

*Villarreal v. Harte-Hanks Communications, Inc.*, 787 S.W.2d 131 (Tex. 1990),
*cert. denied*, 111 S. Ct. 1316 (1991) ........................................................4

*Walker v. Southeastern Newspapers*, 9 Med. L. Rptr. 1516 (Ga. 1982)........................................4

*Weeks v. M-P Publications, Inc.*, 95 Idaho 634, 516 P.2d 193 (1973)........................................15

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C.Cir. 1990)....................................................10

*Wiemer v. Rankin,* 117 Idaho 566, 790 P.2d 347 (1990) .................................2, 6, 7, 10, 11, 14, 16

*Windsor v. Guaranty Trust Life Ins. Co.*, 684 F.Supp. 630 (D.Idaho 1988).....................................28

*Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 923 P.2d 416 (1996)..........................................27

**Statutes:**

Idaho Code § 6-712 .......................................................................................................................28

Idaho Code § 6-713 .........................................................................................................................8

Idaho Code § 6-1604 .....................................................................................................................28

**Other:**

Idaho Jury Instruction 480 (1987)................................................................................................10

R. Sack, *Sack on Defamation: Libel, Slander and Related Problems* (3d ed. 1999)...........................4

*Restatement (Second) of Torts* § 558...........................................................................................10

*Restatement (Second) of Torts* § 611.............................................................................................9

*Restatement (Second) of Torts* § 652..........................................................................................25

*Webster's Ninth New Collegiate Dictionary* (1990)......................................................................16

# I. INTRODUCTION

Defendant Gannett Co., Inc., d/b/a *The Idaho Statesman* (the *"Statesman"*), hereby files this Memorandum of Law in Support of its Motion for Summary Judgment.

# II. PRELIMINARY STATEMENT

Plaintiff in this action - the former head of a public housing authority who was fired amid federal and state investigations for alleged wrongdoing - has challenged the *Statesman*'s lawful coverage of her departure from the housing authority.

Judith Worrell-Payne ("Worrell-Payne"), the plaintiff, was ousted from her job as Executive Director of the Boise City/Ada County Housing Authority ("Housing Authority") in June of 1996, following months of controversy relating to official allegations of mismanagement, nepotism, and frequent absenteeism. Nearly two years after she was fired, Worrell-Payne brought this action against the *Statesman*, attacking virtually every article and editorial[1] the newspaper published about the government investigations, her termination from the Housing Authority, and her subsequent lawsuit against the Housing Authority. Worrell-Payne alleges the *Statesman's* coverage of her termination from the Housing Authority gives rise to claims for defamation, false-light invasion of privacy, and a host of other causes of action.

Worrell-Payne is unable to show - as she must in this action, since she is both a public official and a public figure - that the *Statesman*'s publications were the result of "actual malice," the stringent constitutional standard applicable to all of her claims. Moreover, every allegedly actionable statement is either an accurate account of an official investigation, a statement of opinion, or a substantially true statement of fact. Thus, despite Worrell-Payne's scattergun attack

---

[1] Plaintiff alleged in her First Amended Complaint that ninety-seven (97) separate articles/columns were actionable. This Court, in its Order dated November 29, 1999, narrowed the lawsuit somewhat but still has permitted Worrell-Payne to proceed against forty-three (43) of the publications. *See* Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Material Facts") at § II.P.

on the *Statesman*, all of the coverage of which she complains is protected under the First Amendment and Idaho law.

As there is no genuine issue of fact material to the legal protections afforded the press in its constitutionally recognized role as the public's watchdog on the conduct of government, the *Statesman* is entitled to judgment as a matter of law in this action under Rule 56 of the Federal Rules of Civil Procedure.

## III. ARGUMENT

### A. *Worrell-Payne has failed to adduce clear and convincing evidence of actual malice, as a public official or public figure must in lawsuits against the press.*

The United States Supreme Court has recognized that, in a democratic society, press coverage of public officials is vital to safeguarding the public trust. Thus, the Court has held that under the First Amendment, a public official cannot succeed in litigation against the press unless he can show "actual malice" - defined as the publication of a statement with knowledge of its falsity or in reckless disregard of the truth. *New York Times v. Sullivan*, 376 U.S. 254 (1964). Idaho recognizes that this heightened standard requires subjective evidence of "a knowing state of mind on the part of the publisher." *Bandelin v. Pietsch*, 98 Idaho 337, 342, 563 P.2d 395, *cert. denied*, 434 U.S. 891 (1977). Inferences of mere negligence will not suffice. *Wiemer v. Rankin*, 117 Idaho 566, 575, 790 P.2d 347 (1990) (citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)). Rather, actual malice is a "rigorous standard of proof mandated by *New York Times v. Sullivan*" in a public official's libel action. *Crane v. The Arizona Republic*, 972 F.2d 1511, 1516 (9th Cir. 1992). This rigorous requirement applies equally to ancillary torts that arise out of allegedly libelous statements, such as false light invasion of privacy and intentional infliction of emotional distress. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

In addition to actions by public officials, the Supreme Court also has held that our open society mandates the same "actual malice" protection for press coverage of people fairly deemed "public figures." *Gertz v. Welch*, 418 U.S. 323, 342 (1974). The Idaho Supreme Court expansively has held that the category of public figures includes "both the individual who becomes embroiled in a public controversy through no effort of his own and the individual who actively generates controversy - both abdicate their anonymity." *Bandelin*, 98 Idaho at 340.

Worrell-Payne, given her position with the Housing Authority, is a public official for purposes of this litigation. Moreover, as she was the central focus of the controversy surrounding her management of, and the government investigations into, the Housing Authority, she also is a public figure.

### i.    *Worrell-Payne is a public official.*

The United States Supreme Court decades ago held that, for constitutional purposes, the definition of "public official" is to be construed broadly.

> [T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

*Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Consistent with this, "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees" they are a "public official" who must prove actual malice. *Id.* at 86 (holding "a substantial argument" exists that former supervisor of a ski recreation area, who reported to three elected county commissioners was a "public official" based on "the importance of his role"). [2]

---

[2]    While no Idaho court has decided whether the chief executive of a Housing Authority is a public official in

In this action, the important function of the Housing Authority - and the significant control wielded by its chief executive - clearly mandate application of the actual malice standard to Worrell-Payne.[3] For over ten years, Worrell-Payne ran Idaho's largest public housing authority in Idaho, with an annual operating budget of approximately $9 million in 1996. Defendant's Exhibit 15 ("Def. Ex. 15") at 20:3-7, 20:11-22, 56:12-21; Def. Ex. 16 at 2; Def. Ex. 27 at WP000568. As such, she was responsible for the management, administration and fiscal accountability of the Housing Authority – a public agency charged with exercising "essential governmental functions" to provide decent, safe and sanitary housing to eligible senior citizens, the handicapped and families of limited income. Def. Ex. 15 at 13:3-14:7, 64:24-65:5; Def. Ex. 16 at 1; Def. Ex. 18 at 1; Idaho Code § 50-1904. Indeed, as Executive Director, Worrell-Payne: managed approximately 30 employees (Def. Ex. 15 at 66:2-12); expended private and public funds (Def. Ex. 18 at 2); acted as contracting officer for all Housing Authority contracts (Def. Ex. 15 at 66:16-67:18; Def. Ex. 18 at 2); ensured that all housing programs were administered consistent with applicable federal rules and regulations (Def. Ex. 18 at 1); established standards, goals and objectives for the Housing Authority (*Id.*); met with community and resident leaders

litigation against the press, courts around the country - applying the same First Amendment standard - have held a wide range of public servants to the actual malice standard. These include: the appointed Executive Director of the State Human Relations Commission *(Walker v. Southeastern Newspapers*, 9 Med. L. Rptr. 1516 (Ga. 1982)); a director of city safety *(Shipley v. Knoxville Journal Corp.*, 670 S.W.2d 222 (Tenn. Ct. App. 1984)); a member of a public-school board *(Strong v. Oklahoma Publishing Co.*, 899 P.2d 1185 (Okla. Ct. App. 1995)); an assistant city manager *(Brown v. K.N.D. Corp.*, 529 A.2d 1292 (Conn. 1987)); a county purchasing agent *(Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162 (Tenn. 1992), *cert. denied*, 113 S. Ct. 2931 (1993)); a secretary hired by the public works department *(Grzelak v. Calumet Publishing Co.*, 543 F.2d 579 (7th Cir. 1975)); a chief deputy clerk in a county clerk's office *(Cooper v. Rockford Newspapers, Inc.*, 365 N.E.2d 744 (Ill. App. Ct. 1977)); the non-elected administrator of a county motor pool *(Clawson v. Longview Publishing Co.*, 589 P.2d 1223 (Wash. 1979) and related cases therein); the personnel coordinator in the office of Parish Court Clerk *(Guzzardo v. Adams*, 411 So.2d 1148 (La.App.), *cert. denied*, 415 So.2d 942 (La. 1982)); and a county social worker *(Villarreal v. Harte-Hanks Communications, Inc.*, 787 S.W.2d 131 (Tex. 1990), *cert. denied*, 111 S. Ct. 1316 (1991)). *See also* R. Sack, *Sack on Defamation: Libel, Slander and Related Problems* § 5.2.1 at 5-4 to 5-10 (3d ed. 1999) (the Honorable Robert Sack, United States Circuit Court of Appeals for the Second Circuit, has compiled one of the most comprehensive lists of cases where plaintiffs were held to be "public officials").

[3] "[I]t is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.'" *Rosenblatt*, 383 U.S. at 88.

and organizational representatives regarding planning and partnering for major opportunities (*Id.* at 2); represented the Housing Authority to outside constituents in public presentations and meetings (*Id.*); and generally implemented and administered the policies and programs established by the Housing Authority's Board of Commissioners (Def. Ex. 18; Def. Ex. 65 at 2). Finally, she was responsible for drafting and passing state legislation to allow housing authorities to "be more active in providing more housing for the low-income elderly and disabled people that we served." Def. Ex. 15 at 563:2-564:5.

The record thus makes clear that Worrell-Payne, as Executive Director of the Housing Authority, had or appeared "to the public to have, substantial responsibility for or control over the conduct of governmental affairs."[4] *Rosenblatt*, 383 U.S. at 85. Given the undisputed record of her wide-ranging powers and duties, "the public has an independent interest in the qualifications and performance of the person who holds" the office of the Housing Authority's top executive. *Id.* Thus, Worrell-Payne must be deemed a public official and held to the actual malice standard.

### ii. *Worrell-Payne is also a public figure in this action.*

The record further reflects that Worrell-Payne, by virtue of her position with the Housing Authority and her public response to the government investigations, "bec[ame] embroiled in a public controversy" such that she is also a public figure under actual malice law. *Bandelin*, 98 Idaho at 340. Worrell-Payne testified in her deposition that as part of her duties, she was the Housing Authority's designated press spokesperson for "any information concerning the operation of the Authority or other non-restricted information concerning the plans and operations of the Authority or the Board of Commissioners." Def. Ex. 15 at 73:2-76:23; Def. Ex.

---

[4] In a Texas case very similar to this one, *Galveston Newspapers, Inc. v. Norris*, 981 S.W.2d 797 (Ct.App.Tx. 1998), the parties stipulated that the Director of the Galveston Housing Authority was a "public official" given the

19 at ¶ 4, and Def. Ex. 20 at ¶ 4. Pursuant to these duties, she periodically convened press conferences and issued press releases. Def. Ex. 15 at 76:24-78:3. She also voluntarily and knowingly entered the spotlight through her advocacy in state government affairs, for it was her responsibility to spearhead the drafting and enactment of legislation to allow agencies like the Housing Authority to "be more active" in securing the housing needs of the elderly, disabled and impoverished. Def. Ex. 15 at 563:2-564:5. Finally, in response to the various investigations of her, Worrell-Payne convened at least one press conference to discuss the charges and her defenses. Def. Ex. 15 at 274:20-275:24; Def. Ex. 28 at HA000601-609.

Thus, by her own characterization, Worrell-Payne served as the public embodiment of the Housing Authority's mission, and she was very involved with the Legislature's action on public-housing issues. Moreover, by virtue of her systematic and regular contacts with the press, she clearly "enjoy[ed] significantly greater access to the channels of effective communication," affording her "a more realistic opportunity to counteract false statements than private individuals normally enjoy" - the hallmark of a public figure. *Gertz*, 418 U.S. at 344. Accordingly, in addition to her status as a public official, Worrell-Payne should be declared a public figure in this action.

### iii. *Worrell-Payne cannot demonstrate, with "convincing clarity," that the Statesman acted with actual malice.*

To prove actual malice - as she must - Worrell-Payne must point to clear and convincing evidence with which a rational jury could find that the *Statesman* published a defamatory statement either with knowledge of its falsity or a reckless disregard for the truth. *Wiemer*, 117 Idaho at 575 (citing *Harte-Hanks Communications,* 491 U.S. at 668). Here, Worrell-Payne is unable to set forth any evidence - let alone clear and convincing evidence - of actual malice.

---

nature of his duties and responsibilities.

In response to repeated inquiries as to her purported evidence of the *Statesman's* alleged malice, Worrell-Payne has responded that generally, the newspaper's word choice, type of font, context of articles, placement of articles, and headlines demonstrate the *Statesman's* malice. *See* Def. Ex. 15 at 249:12-252:10; 265:12-266:22; 276:2-277:1; 291:14-292:20; 294:14-295:15; 311:23-312:19; 318:21-319:12; 336:10-337:3; 341:13-342:9; 346:21-347:3; 354:8-24; 362:23-363:12; 368:6-16; 369:15-25; 379:8-18; 387:9-24; 394:22-395:13; 413:9- 416:11; 423:3-10; 424:13-20; 440:5-10; 441:22-442:3; 445:16-21; 453:12-24; 465:9-13; 466:12-16; 468:24-469:5; 475:9-14; 476:6-9; 478:4-8; 479:4-8; 480:12-16; 488:4-8; 490:5-9; 504:13-505:6; 506:7-10; 507: 7-19; 511:18-23; 513:3-14; 517:5-11; 527:14-528:15; 529:17-22; 535:15-20; 537:6-9; 543:5-13; 545:16-546:6; 549:4-8; 552:2-6; 555:3-7; and 556:20-557:5. *See also* Def. Ex. 11 at 2. Worrell-Payne also asserts that she distributed an information packet to Frank Lockwood, a reporter for the *Statesman*, that explained her responses to various allegations of wrongdoing, and that the *Statesman* acted with malice in failing to publish this information. *See* Def. Ex. 15 at 341:13-342:9; 370:1-14; 414:20-415:19.

However, such an argument - which, at most, amounts to accusations of negligence - is not sufficient proof of actual malice, which requires more than mere departure from reasonably prudent conduct. *Wiemer*, 117 Idaho at 575. Worrell-Payne has adduced utterly no evidence of "a knowing state of mind on the part of the publisher," *Bandelin*, 98 Idaho at 342, as she must.[5] The record is absent of any hint that anyone at the *Statesman* "in fact entertained serious doubts as to the truth of the published statement" or that "the defendant actually had a "high degree of awareness of . . . probable falsity." *Wiemer*, 117 Idaho at 575 (emphasis in original). And while

---

[5]  Indeed, in testimony that Worrell-Payne has not factually disputed, all witnesses associated with the *Statesman* have testified they harbored no doubts prior to publication about the accuracy of the coverage of Worrell-Payne and the Housing Authority. *See* Def. Ex. 13 at 178:14-16; Def. Ex. 14 at 70:24-25-71:1-6; Def. Ex. 12 at 82:12-15; Affidavit of Dan Popkey ("Popkey Aff.") at ¶ 4; Affidavit of John Costa ("Costa Aff.") at ¶ 4.

Worrell-Payne attaches significance to the "information packet" she claims to have furnished to the *Statesman*,[6] any alleged failure of the newspaper to publish allegedly exculpatory material she offered simply does not constitute actual malice. *See, e.g., Harte-Hanks Communications*, 491 U.S. at 692 n.37 (quoting *Edwards v. National Audubon Society*, 556 F.2d 113, 121 (2d Cir.), *cert. denied*, 434 U.S. 1002 (1977) (holding publication of statement in the face of plaintiff's denial does not demonstrate actual malice); *Roberts v. Dover*, 525 F. Supp. 987 (M.D. Tenn. 1983) (holding publication of allegations of wrongdoing about a public official, even if the official denies the charges to a journalist, "would not support an inference" of actual malice). Worrell-Payne's evidence falls entirely short of the actual malice mark, and the *Statesman* is entitled to judgment as a matter of law.

**B.    The "fair report privilege" also bars Worrell-Payne's claims.**

The majority of Worrell-Payne's allegations attack the *Statesman*'s publication of articles/editorials concerning actions taken by, and statements made during, meetings of the Housing Authority's Board (Def. Exs. 35, 37, 42, 43, 44, 45, 46, 67, 72, 73, 74, 76, 77, 78, 79, 80, and 82), and concerning the official investigations by the U.S. Department of Housing and Urban Development and Idaho government into allegations of wrongdoing by Worrell-Payne (Def. Exs. 33, 34, 37, 40, 42, 43, 44, 45, 48, 49, 50, 52, 53, 54, 57, 58, 59, 60, 61, 66, 69, 70, 71, 72, and 82). These publications, however, are entirely privileged and non-actionable under Idaho Code § 6-713(4) and its related common-law fair report privilege.

Like nearly every jurisdiction in the country,[7] Idaho recognizes that an essential ingredient for a free press is the ability of journalists to report, without fear of liability, on

---

[6]  Worrell-Payne has failed to produce a copy of the "information packet" that was allegedly distributed at the May 14, 1996 press conference. Additionally, Lockwood does not remember receiving such a packet. Def. Ex. 13 at 80:12-81:15. Under actual malice case law, however, this fact is immaterial to the litigation.

[7]  "[V]irtually every jurisdiction recognizes a privilege for fair and accurate media accounts. The privilege is not

official government pronouncements and proceedings.[8] Thus, Idaho Code § 6-713(4) provides

an absolute privilege against defamation claims for "a fair and true report, without malice, of a

judicial, legislative or other public official proceeding, or of anything said in the course thereof."

Moreover, since at least 1796, the common law has recognized a privilege of fair report of

official proceedings. *Ronwin v. Shapiro*, 657 F.2d 1071, 1075 (9th Cir. 1981). The rule also is

expressed in § 611 of the *Restatement (Second) of Torts*: "The publication of defamatory matter

concerning another in a report of an official action . . . is privileged if the report is accurate and

complete or a fair abridgement of the occurrence reported."

In fact, under the *Restatement*'s rendition, a privileged report of an official proceeding is

not only immunized from libel claims, but it also is not actionable under alternative causes of

action: "If the report of a public official proceeding is accurate or a fair abridgement, an action

cannot constitutionally be maintained[.]" *Restatement (Second) of Torts* § 611, comment b. As

long as the coverage fairly sets forth the information from an official source or proceeding, it is

fully protected "even though the publisher himself does not believe the defamatory words he

reports to be true and even when he knows them to be false." *Restatement (Second) of Torts* §

611, comment a.

In this action, Worrell-Payne does not - and cannot - dispute that the *Statesman*

accurately recounted information from multiple official pronouncements and proceedings in

which she was accused of mismanagement, nepotism, frequent absenteeism, and other conduct in

the discharge of her public duties. *See, e.g.*, Material Facts at § II.D-H. As officials

disseminated all this information, these articles are privileged against liability for both

---

intended as merely a convenient method of shielding the press from tort liability, but instead is intended to ensure
that information is made available to the public concerning what occurs in official proceedings." *Pittman v. Gannett
River States Publishing, Corp.*, 836 F. Supp. 377, 382 (S.D.Miss. 1993).

[8] The privilege is premised on "the interest of the public in obtaining information about what occurs in official

defamation and invasion of privacy claims under Idaho Code § 6-713(4) and the fair report privilege. For this reason as well, the *Statesman* is entitled to judgment as a matter of law.

**C.      *Worrell-Payne has not met her burden of demonstrating the publication of a provably false statement of fact.***

   ***i.      Falsity is the plaintiff's burden in cases like this one.***

Under Idaho law, to prevail on a defamation claim, Worrell-Payne must prove that each of the challenged statements is: (1) a false statement of fact; (2) published by the *Statesman*; (3) "of and concerning" Worrell-Payne;[9] (4) made with fault; (5) which proximately caused injury to Worrell-Payne's reputation; and (6) was unprivileged. *See generally* Idaho Jury Instruction 480 (1987); *Restatement (Second) of Torts* § 558 (1977). Moreover, under the First Amendment, where a statement constitutes a matter of public concern, the burden to prove falsity always rests with the plaintiff. *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 776 (1986).

Here, every statement Worrell-Payne challenges concerned the performance of her job with the Housing Authority. *See* Material Facts at § II.P. As such, the *Statesman*'s coverage touched on a matter of public concern, as "[t]he performance of a public official is at the heart of the subjects covered by the freedom of speech and freedom of the press protections under the First Amendment" and, therefore, are matters of public concern. *Wiemer*, 117 Idaho at 570. Worrell-Payne is unable to meet this burden, since the record shows every item the *Statesman*

---

proceedings." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C.Cir. 1990).

[9]   To the extent that Worrell-Payne's claims are based on statements critical of the Housing Authority in general, such claims must fail as they are not "of and concerning" her. Indeed, in *New York Times v. Sullivan*, 376 U.S. at 292, the Supreme Court held that "an otherwise impersonal attack on governmental operations" "may not constitutionally be utilized to establish that was a libel of an official responsible for those operations." *See also Andrews v. Stallings*, 892 P.2d 611 (N.M. Ct.App. 1995); *Barger v. Playboy Enterprises*, 564 F.Supp. 1151, 1153 (N.D. Cal. 1983), *aff'd*, 732 F.2d 163 (9th Cir.), *cert. denied*, 469 U.S. 853 (1984) (holding plaintiffs must show an allegedly libelous statement "referred to them personally").

published was either substantially true[10] or a statement of subjective opinion that can not be proved or disproved in a libel action.[11]

### ii.   *Worrell-Payne has pointed to no false facts in the Statesman's publications.*

Worrell-Payne complains of the *Statesman*'s articles or editorials reporting on a number of facts. Def. Ex. 4 at ¶ 8. Again, it is her burden to prove to this Court that the reporting on these facts was false. *Wiemer*, 117 Idaho at 570. As Worrell-Payne's deposition testimony and documents disclosed in discovery reflect, each and every fact in the *Statesman*'s reports was substantially true.

For example, she complains of reports that her son and his girlfriend lived in a house built within Hudgins Place,[12] a rent-to-own community administered by the Housing Authority. Def. Ex. 25 at HA00486; Def. Ex. 27 at WP00572; and Def. Ex. 4 at ¶ 8(b); yet Worrell-Payne does not dispute that her son Isaac Worrell indeed lived in Hudgins Place while she was Executive Director. Def. Ex. 15 at 86:4-88:6.

Similarly, Worrell-Payne objects to the *Statesman's* report that she had publicly alluded to a judge, whose name she said she could not recall, whom she intimated had "once sought preferential treatment from the [housing] authority." Def. Ex. 4 at ¶8(d). It is undisputed, however, that Worrell-Payne said the following at a May 14, 1996 press conference:

---

[10]  Substantial truth - not literal accuracy - is the standard by which truth is measured in Idaho libel litigation. "In a slander or libel suit it is not necessary for the defendant to prove the literal truth of his statement in every detail, rather it is sufficient for a complete defense if the substance or gist of the slanderous or libelous statement is true." *Baker v. Burlington Northern, Inc.*, 99 Idaho 688, 690, 587 P.2d 829 (1978).

[11]  Of course, if Worrell-Payne's defamation claims fail, her libel *per se* claims also fail.

[12]  "Hudgins Place was a rent-to-own project . . . where eligible persons could rent single-family dwellings built by the Housing Authority utilizing bond proceeds pursuant to state law. Generally and after a period of time of rental (two or three years) the renters, upon fulfilling program requirements, could move into the purchase phase wherein all or part of the down payment and closing costs could be gifted by the Housing Authority depending on the need and position of the renter." Def. Ex. 11 at 9.

> FRANK LOCKWOOD: Have you ever given preferential
> treatment in giving out housing to elected officials, members of
> their family?
>
> MS. WORRELL-PAYNE: Never. I was called by a judge, who
> shall remain nameless. I should leave that one out, I guess. I
> shouldn't say judge. Never mind, scratch that, please.

Def. Ex. 28 at 129:15-21. Moreover, Worrell-Payne does not dispute that the next day, a

reporter specifically asked her about the unnamed judge, and "[s]he said she couldn't remember

his name without looking it up," Def. Ex. 13 at 189:11-12, and "wouldn't look up the name for

me." *Id.* at 189:21-22. *See generally* Def. Ex. 13 at 187:12-189:22 and Def. Ex. 15 at 211:25-

212:24.

Further, she objects to the *Statesman's* report that, "Worrell-Payne claimed the authority

received the only perfect score on a recent evaluation." Def. Ex. 4 at ¶ 8(d). Yet she admitted in

her deposition, "I claimed that the Housing Authority at the time of those evaluations had

received the only perfect score and that is true." Def. Ex. 4 at 369:9-14. Worrell-Payne also

takes issue with the newspaper's report that "[a]t one point, her travel did not require board

approval" (Def. Ex. 4 at ¶ 8(d)); but in her deposition she agreed that this statement is

substantially true. Def. Ex. 15 at 197:17-199:2 (stating that not all of her travel she did as

Executive Director required Board approval); 360:6-9. *See also* Def. Ex. 28 at HA000595-97

(Housing Authority Board's consideration of motion to change procedures to pre-approve <u>all</u>

travel by the Executive Director).

Worrell-Payne also alleges falsity regarding the report that her employment contract with

the Housing Authority "has never been approved by federal housing officials as required . . ."

Def. Ex. 4 at ¶ 8(d). As set forth in detail in the Material Facts at § II.M, however, the Housing

Authority did in fact require that Worrell-Payne's employment contract be approved by HUD

before it would become effective, and Worrell-Payne admits that HUD never approved the

contract. She also challenges the report that she "derailed another board special board meeting by falsely notifying the media that a quorum was unavailable to meet" (Def. Ex. 4 at ¶ 8(d)), despite the undisputed facts that: (1) Worrell-Payne issued a press release saying the board meeting was cancelled for lack of a quorum; (2) three of the five Board members had arrived on time for that meeting; (3) the city attorney appeared at that meeting and stated that it should not have been cancelled for lack of a quorum. *See* Material Facts at § II.I.

Finally, Worrell-Payne takes umbrage at the *Statesman*'s report that, "Taxpayers could have been responsible if investors had pulled out of a housing authority project." Def. Ex. 4 at ¶ 8(d). It is undisputed, however, that the Housing Authority used interim funding from Key Bank to build Hudgins Place (the project referenced in this passage), and these notes, totaling $8.3 million, were set to expire on June 1, 1996. *See* Def. Ex. 97. To avoid having to cover the bank notes, the Housing Authority Board needed to secure new notes,[13] totaling $7.5 million, by May 30, 1996. *Id.* at 00037. Thus, the *Statesman* was accurate in reporting that, absent a new source of funding, it would have been necessary to tap public funding sources - *i.e.*, the "taxpayers" - in order to cover the debt.

These are the only <u>specific facts</u> that Worrell-Payne alleges were inaccurately reported. As her testimony and the rest of the record reflect, however, each report was substantially accurate. Thus, Worrell-Payne cannot sustain her burden - under the First Amendment and Idaho law - to demonstrate the *Statesman* published a false statement of <u>fact</u> about her. For this additional reason, her claims must fail.

---

[13] Moreover, the Housing Authority did not even have the funds to pay off the debts if the new funding could not be secured; Worrell-Payne's testimony on this subject confirms that the Housing Authority only had about "$2 million" at the time (well below the $7.5 million required to cover the debts). Def. Ex. 15 at 371:17-22.

### iii. *The remaining statements of which Worrell-Payne complains are not verifiable statements of fact and/or are otherwise non-actionable opinion.*

Worrell-Payne complains of numerous other statements published in the *Statesman*. *See* Def. Ex. 4 at ¶ 8(a)-(e). The majority of these statements, however, are not actionable. Rather, they reflect the non-verifiable, evaluative judgments of the writer or speaker. Such statements, under the decisions of the United States Supreme Court, are entirely protected from liability: "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection[.]" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (*cited in Idaho State Bar v. Topp*, 129 Idaho 414, 416, 925 P.2d 1113, 1115 (1996), *cert. denied*, 520 U.S. 1155 (1997)). Moreover, the Idaho Supreme Court recognizes that newspaper readers, presented with an accurate accounting of facts, are entitled to read another's opinion about those facts and decide the issue for themselves.

> In determining whether a statement is an assertion of fact or of constitutionally protected opinion, 'the important consideration . . . is not whether the particular statement fits into one category or another, but whether the particular article provided sufficient information upon which the reader could make an independent judgment for himself.'

*Idaho State Bar*, 129 Idaho at 416 (citing *Wiemer*, 117 Idaho at 572).

For example, Worrell-Payne takes issue with the *Statesman*'s reports that: she was "assailed" by critics for, and investigated for, alleged "nepotism" and "favoritism" in the agency's hiring decisions and her son's residence at Hudgins Place (Def. Ex. 4 at ¶¶ 8(a) and 8(b)); she had been fired "amid allegations of corruption" (Def. Ex. 4 at ¶ 8(c)); that the Housing Authority "mishandled" the *Lubcke* lawsuit (Def. Ex. 4 at ¶ 8(d)); and the Housing Authority had survived the "1996 scandal surrounding" Worrell-Payne and had been "scandal-plagued" (Def.

Ex. 4 at ¶ 8(c) & (d)). Yet each statement, in the context[14] in which it was published, is non-actionable because it is either unverifiable or a conclusion drawn from true facts.

For instance, as to "nepotism" and "favoritism," again, Worrell-Payne admits that her son lived in public housing under her control. Def. Ex. 15 at 86:4-88:6. Moreover, Worrell-Payne admits that she is related by marriage to one employee she hired for the agency, Christine Thiemann (Def. Ex. 15 at 159:14-160:8), and she also hired her son's live-in girlfriend, Rebecca Bushman (Def. Ex. 31 at HA000726 and HA000742; Def. Ex. 15 at 160:9-161:23). Therefore, the underlying facts from which these subjective evaluations derive are true, and subjective conclusions drawn from them - such as "nepotism" - are not actionable.

Further, charges of nepotism inherently reflect subjective evaluations and, therefore, are not provable as fact. For example, in *Maynard v. The Daily Gazette Co.*, 447 S.E.2d 293 (W.Va. 1994), the West Virginia Supreme Court rejected a libel claim arising out of a charge of nepotism, on the express grounds that such an allegation "is not something that can ever be ascertained with certainty to the satisfaction of a questioning public" and, therefore, is not actionable.

> Charges of favoritism and nepotism flourish in environments
> where people compete for positions, and no independent or
> objective evidence is likely to appease those who make an issue of
> this incident and whose minds are already made up.

*Id.* at 297.[15] Similarly, opining "a lawsuit was mishandled" – another item in the *Statesman* that Worrell-Payne complains about - is clearly non-actionable opinion. *See Partington v. Bugliosi*,

---

[14] Context is a key factor in evaluating whether a given statement is non-actionable. For example, the Idaho Supreme Court has observed that "[p]olitical epithets and hyperbole" uttered in the context of discussions about public officials' performance are given wide latitude under the First Amendment. *Weeks v. M-P Publications, Inc.*, 95 Idaho 634, 639, 516 P.2d 193, 198 (1973). Moreover, Justice Brennan has noted that, "Certain formats - editorials, reviews, political cartoons, letters to the editor - signal to the reader" a context in which non-verifiable statements of opinion abound. *Milkovich*, 497 U.S. at 32 (Brennan, J., dissenting). Worrell-Payne has acknowledged that, especially with editorials and columns, the public expects to find statements of opinion in editorials. Def. Ex. 15 at 356:3-357:17, 452:12-15.

56 F.3d 1147 (9th Cir. 1995) (holding that negative statements regarding a lawyer's performance during trial are not actionable). *See also Sullivan v. Int'l Brotherhood of Electrical Workers*, 157 F.3d 1092 (7th Cir. 1998) (calling plaintiff "a very poor lawyer" is too "difficult to verify or refute" to be actionable); *Gotbetter v. Dow Jones & Co., Inc.*, 687 N.Y.S.2d 43 (N.Y. App. 1999) (holding as protected opinion a statement that another lawsuit plaintiff filed was "baseless").

As to the phrases "corruption," "scandal-plagued," and the like, again, it is entirely undisputed that the Housing Authority terminated Worrell-Payne after concluding that she "did not maintain a high standard of ethics, honesty and integrity in all professional matters." Def. Ex. 64 at WP000266. This record of her termination from the Housing Authority therefore not only comports with the common definitions of the terms used or quoted in the newspaper,[16] it also comports with the factual record in this case, upon which "the reader could make an independent judgment for himself." *Idaho State Bar*, 129 Idaho at 416 (citing *Wiemer*, 117 Idaho at 572). These statements, therefore, are not actionable, and any claim Worrell-Payne bases on them cannot survive.

### iv. *Worrell-Payne's "implied defamation" claim cannot sidestep the Statesman's protections for publishing substantially true information or non-actionable opinion.*

Worrell-Payne alleges implied defamation from 28 articles and 3 editorials[17] published in the *Statesman*. Def. Ex. 4 at ¶ 9. Specifically, she claims these publications falsely implied that

---

[15] *See also Barter v. Wilson*, 512 N.E.2d 816 (Ill. App. 1987) (article on developer's success in obtaining permits, quoting person as saying "the fix is in" at city hall, held protected).

[16] *Webster's Dictionary* defines "corruption" as "impairment of integrity, virtue or moral principal." *Webster's Ninth New Collegiate Dictionary* ("*Webster's*") at 294 (1990). It defines "scandal" as "loss of or damage to reputation caused by actual or apparent violation of morality or propriety." *Id.* at 1048. Thus, the Housing Authority's characterization of the grounds for Worrell-Payne's severance corresponds perfectly with the newspaper coverage that she challenges. *See* Material Facts at § II.C-L.

[17] These articles are identified in the Material Facts as articles 1, 2, 3, 5, 7, 8, 10, 11, 12 (editorial), 13, 15, 16, 17, 18, 19, 20, 21, 22 (editorial), 23, 24, 25, 26 (editorial), 27, 28, 30, 31, 32, 33, 34, 42 and 43 (collectively "Implication Articles"). *See* Material Facts at § P.

she: was excessively absent from work (*Id.* at ¶ 9(a)); was being "investigated pursuant to official allegations and charges of illegal conduct" (*Id.* at ¶ 9(b)); "engaged in nepotism and favoritism with respect to family members and employees" (*Id.* at ¶ 9(c)); "lack[ed] [ ] fitness for her job" because the newspaper implied she had "a lavish personal tax style" and "misappropriation of tax dollars"(*Id.* at ¶ 9(d)); "engaged in excessive travel outside of the state" (*Id.* at ¶ 9(e)); used her Housing Authority-owned Chevy Blazer in a manner that was "wrongful and unauthorized"(*Id.* at ¶ 9(f)); mismanaged the agency (*Id.* at ¶ 9(g)); and generally mischaracterize her conduct by, for example, using "highly inflammatory language" (*Id.* at ¶ 9(h)).

These allegations reflect Worrell-Payne's desperate efforts to plead around the basic prohibitions against suit for the publication of substantially true facts, and they must be rejected. Courts around the country routinely prohibit public official libel plaintiffs from manufacturing a defamatory "implication" where a statement is otherwise not actionable.[18] As one federal district court observed:

> [A]llowing public officials to sue for false implications arising
> from true statements would inhibit the publication of opinions and
> fair comment regarding public officials. Such an inhibition would
> undermine the freedom to criticize public officials, a freedom
> deemed essential to our form of government.

*Conroy v. Kilzer*, 789 F. Supp. 1457, 1460 (D. Minn. 1992) (citation omitted). The United States Court of Appeals for the Ninth Circuit, in an action in which plaintiff claimed an implied defamation, similarly observed:

> Another important protection is that the media and public are free
> to express their opinions regarding the fitness or qualifications of

---

[18]  *See, e.g., Pierce v. Capital Cities Communication, Inc.,* 576 F.2d 495, 504 (3rd Cir.), *cert. denied,* 439 U.S. 861 (1978); *Sassone v. Elder,* 626 So.2d 345, 354 (La. 1993); *Diesen v. Hessburg,* 455 N.W.2d 446 (Minn. 1990); *Strada v. Connecticut Newspapers, Inc.,* 477 A.2d 1005, 1010 (Conn. 1984); *Schaefer v. Lynch,* 406 So.2d 185, 188 (La. 1981); *Mihalik v. Duprey,* 417 N.E.2d 1238 (Mass Ct. App. 1981).

> public officials, including judges, to hold office, as long as in
> doing so they do not make statements of fact that are otherwise
> actionable.

*Dodds v. American Broadcasting Co.*, 145 F.3d 1053 (9th Cir. 1998), *cert. denied*, 119 S.Ct. 866 (1999). *See also Lewis v. Time, Inc.*, 710 F.2d 549 (9th Cir. 1983) (rejecting implied defamation action, on grounds statements were non-actionable opinion, where plaintiff argued court should not examine each statement in publication, but consider the "article taken overall.")

In this action, because each and every statement sued upon has not been demonstrated to be substantially false, or is non-actionable opinion, protected by the fair report privilege, or simply not defamatory, this Court must reject Worrell-Payne's urgings to consider the "articles taken overall." *See Lewis,* 710 F.2d 549. Taking each of her categories of implied libel as she has expressed them:

• <u>excessive absenteeism</u>: Nothing in the *Statesman*'s coverage implies "Plaintiff was excessively absent from work" as she claims. Def. Ex. 4 at ¶ 9(a). Instead, the *Statesman* reported the undisputed fact that charges of absenteeism had been leveled against Worrell-Payne in official fora, rendering the report both true and protected by privilege. Moreover, Worrell-Payne in this action has not disputed the factual underpinning for the complaints to the government investigators that she was frequently out of the Housing Authority's Boise office during working hours.

• <u>investigations of allegedly illegal conduct</u>: Worrell-Payne claims a false implication that she "was being investigated pursuant to official allegations and charges of illegal conduct." Def. Ex. 4 at ¶ 9(b). The *Statesman* submits that this is not even an "implication," but rather, whether or not Worrell-Payne was being investigated is a fact. And the record is replete with evidence that this fact was true. *See* Material Facts at § II.F & G.

• nepotism and favoritism: Worrell-Payne points to a number of articles reporting that her son lived with his girlfriend in Housing Authority-controlled property and the agency built a home for an employee "even though other Hudgins Place houses sat vacant." Def. Ex. 4 at ¶ 9(c). As the *Statesman* has demonstrated, *supra* § III.C.iii, any inference of nepotism from these facts would not be verifiable, and, thus, is non-actionable opinion. Moreover, the facts reported are entirely true. *See* Material Facts at § II.C.

• extravagance: Worrell-Payne does not dispute the facts underlying the editorial she challenges here - that she spent large sums of money shopping on a single day, purchasing a total of nearly $2,000 in gifts for Housing Authority tenants, owned a 5-acre home, spent $290 on telephone calls during a single airplane flight, and drove a Jaguar. *See* Material Facts at § II.C. Def. Ex. 31 and Def. Ex. 32. Any implication from these true facts, such as the "lavish personal lifestyle" she contends this column suggested (Def. Ex. 4 at ¶ 9(d)), would be an opinion drawn from stated facts. Thus, it is subject to bedrock First Amendment protection. *See Idaho State Bar*, 129 Idaho at 416.

• excessive travel: Worrell-Payne points to several publications noting that the investigations of her conduct in Boise included examination of her "extensive travel," as the newspaper characterized it. Def. Ex. 4 at ¶ 9(e). She also challenges an article published after she was fired, reporting that federal officials were examining the travel budget of her new employer, the New Brunswick (N.J.) Housing Authority. *Id.* Yet, again, it is undisputed that the Housing Authority in fact did question her travel, Def. Ex. 15 at 437:22-25 and Def. Ex. 28 at HA000595-97, as part of its oversight of her activities as Executive Director. At no point did the *Statesman* report an independent conclusion that she in fact had violated a rule restricting her travel. Moreover, Worrell-Payne in her deposition admitted that HUD officials were looking at

the New Jersey agency's records for improprieties with travel expenses. Def. Ex. 15 at 598:5-15, 600:16-20. Thus, in the context in which they were reported, the *Statesman*'s references to the investigation of Worrell-Payne's "extensive travel" in Boise, and the HUD inquiry in New Jersey, do not give rise to any actionable inference and are admittedly true.

• the Chevy Blazer: Worrell-Payne contends the *Statesman's* reports about the use of her official vehicle "falsely implied an abuse of power" and was "wrongful and unauthorized." Def. Ex. 4 at ¶ 9(f). She points to a single published statement to support her claim (*Id.*), and, again, this claim stems from the report of an undisputed fact: Worrell-Payne, as reported, drove the Blazer to Oregon for a family vacation. Def. Ex. 15 at 512:24-513:18. No actionable implication may be drawn from the admittedly truthful report of a simple fact.[19]

• mismanagement: Worrell-Payne points to a single article and, without specifying a passage, claims it portrays her in a "false light" and implies that she mismanaged the agency. Def. Ex. 4 at ¶ 9(g). Again, she has failed to demonstrate the article contains a single false fact, let alone a false implication.[20] Moreover, to the extent that she complains of the *Statesman*'s alleged inference of mismanagement, the record contains sufficient facts to support such an opinion with which the "reader could make an independent judgment for himself." *See Idaho State Bar*, 129 Idaho at 416. Accordingly, such a statement is non-actionable opinion.

• catchall statements of wrongdoing: Worrell-Payne claims that the *Statesman* published a variety of statements "which were impliedly defamatory and which cast Plaintiff in a false

---

[19] Moreover, even if the *Statesman* had explicitly charged that Worrell-Payne abused her office as Executive Director of the Housing Authority – which it did not - such statement would not be actionable. *See Slawik v. News Journal Co.*, 428 A.2d 15, 17 (Del. 1981) (holding charge that county executive "abused office" was a non-actionable statement of opinion). This fact is particularly significant in analyzing Article 22(a) at Def. Ex. 4 at ¶ 9(e).

[20] The *Statesman* is obligated to point out as well that, as of the date this article was published (June 13, 1996), Worrell-Payne had been placed on administrative leave from the Housing Authority pending the outcome of the investigations, which she admits concerned allegations of mismanagement. *See* Material Facts at II.D-K.

light." Def. Ex. 4 at ¶ 9(h). But, a close examination of each of these statements demonstrates that they are not actionable. For instance, Worrell-Payne complains of the *Statesman*'s use of the words "blasted" (Def. Ex. 4 at ¶ 9(h)), "scandals" (*Id.*), "rocked" (*Id.*) and "back on track" (*Id.*) in describing the controversy surrounding the Housing Authority. Such descriptions are non-actionable because they are either unverifiable statements of fact or a conclusion drawn from true facts. *See* Def. Ex. 28 at 126:17-21 and Def. Ex. 15 at 275:18-24 ("blasted"); Material Facts at § II.D-H ("scandals" and "rocked"); Def. Ex. 73 ("back on track").

In support of her claim, Worrell-Payne also points to a statement concerning whether a meeting of the Housing Authority Board – at which she was not present -- was properly conducted pursuant to Idaho's Open Meeting laws. Def. Ex. 46. However, this article makes no mention of Worrell-Payne, nor can one reasonably be inferred. Accordingly, her claim must fail because it is not "of and concerning" her. *See New York Times*, 376 U.S. at 292.

Finally, Worrell-Payne points to two articles and, without specifying a specific passage, claims they portray her in a "false light" and "condemn [her] as an inappropriate representative of Idaho at a private national housing conference." Def. Ex. 4 at ¶ 9(h). Again, she has failed to demonstrate that either article contains a single false fact, let alone a false impression.

Thus, each of Worrell-Payne's arguments of "implied defamation" must be dismissed for the same reasons that her direct attack on the coverage must be dismissed: the *Statesman* published substantially true information, opinions that either cannot be proved true or false or were based on disclosed facts, and protected accounts of official proceedings.

Worrell-Payne's implied defamation claims must also fail because Worrell-Payne must demonstrate with "convincing clarity" that with respect to each and every allegedly false implication, the *Statesman* intended to actually convey the implied false defamatory meaning.

*See Dodds,* 145 F.3d 1053 (*citing Newton v. National Broadcasting Co.,* 930 F.2d 662, 681 (9th
Cir. 1990)). This is the same test as "actual malice" - the intention to tell a knowing falsehood.
As set forth above, Worrell has adduced no evidence, let alone clear and convincing evidence,
that the *Statesman* intended to state, or for that matter imply, anything that was false. *See* Def.
Ex. 13 at 178:14-16; Def. Ex. 14 at 70:24-25 – 71:1-6; Def. Ex. 12 at 82:12-15; Popkey Aff. at
¶¶ 4-5; Costa Aff. at ¶¶ 4-5.

Worrell-Payne obviously contends that the *Statesman*, under no circumstances, could
publish even simple truths about her official conduct - such as the fact that she drove the
Housing Authority's Chevy Blazer to Oregon for a family vacation - without facing punishment
in a libel lawsuit. Obviously, her arguments in this regard are as inimitable to the open
discussion of government so vital to our democracy as they are plainly wrong under the law. For
the foregoing reasons, her implied-defamation claims all must fail.[21]

**D.**    ***Worrell-Payne's other claims all must fail for the same reasons as her libel action.***

Worrell-Payne and her counsel obviously are aware of the insurmountable hurdles she
faces, as a public official and public figure, in bringing her libel and libel *per se* claims.
Undoubtedly, that is why they have chosen to evasively characterize her claims in alternative
theories of false light invasion of privacy, intentional infliction of emotional distress, tortious
interference with contract and tortious interference with prospective economic advantage. *See*
Def. Ex. 4. However, the United States Supreme Court, the Ninth Circuit, and courts around the
country resoundingly have rejected plaintiffs' efforts to make an end-run around the

---

[21]    As the District Court in *McBride v. City of Roanoke Redevelopment and Housing Authority,* 871 F.Supp. 885
(W.D.Va.), *aff'd,* 78 F.3d 579 (4th Cir. 1994), held in granting a similar motion for summary judgment in favor of a
housing authority against its former Executive Director, "[n]either the court nor a reasonable jury can attribute a
defamatory connotation to an admittedly true statement absent an iota of evidence to that effect." *Id.* at 892. Since
Worrell-Payne does not have "an iota of evidence" to support her defamation by implication claims, they must be
dismissed.

constitutional obstacles in public persons' libel lawsuits. Further, as matters of substantive Idaho law, each of Worrell-Payne's parasitic causes of action fail.

In its unanimous decision on this issue, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), the Supreme Court reversed a judgment entered in Rev. Jerry Falwell's favor in his emotional distress action, arising out of a parody depicting Falwell in an incestuous relationship. Chief Justice Rehnquist wrote that the same need for First Amendment "breathing space" underlying the *New York Times v. Sullivan* actual malice standard applies regardless of the cause of action alleged. Thus, the Court ruled that in addition to libel actions:

> [Public] officials and public figures may not recover for the tort of intentional infliction of emotional distress . . . without showing in addition that the publications contained a false statement of fact which was made with "actual malice."

*Hustler Magazine*, 485 U.S. at 56. In announcing this rule, the Court built upon earlier precedent broadening the application of the actual malice standard to other tort claims. Twenty years earlier, the Court held that in false light invasion of privacy actions arising out of publications on matters of public concern, a plaintiff also must show actual malice. *Time, Inc. v. Hill*, 385 U.S. 374 (1966).

For decades, and especially since *Hustler Magazine*, federal and state courts around the country consistently have deflected plaintiffs' efforts to recast defective libel actions as other torts. Thus, the Ninth Circuit, in a decision authored by then-Judge Anthony Kennedy, even before *Hustler Magazine*, held that where a statement is not actionable as defamation, an emotional distress claim must fail. *Koch v. Goldway*, 817 F.2d 507, 510 (9th Cir. 1987). There, the court held a mayor's comment associating plaintiff with Nazi elements was protected opinion and upheld dismissal of the defamation claim.[22]

---

[22] The court in *Koch* further found as a matter of common law defendant's comment, although "reprehensible" and

The case law is uniform in holding that publications immune from libel cannot be challenged under other tort theories. *See, e.g., Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193 n.2 (9th Cir.), *cert. denied*, 493 U.S. 812 (1989) (dismissing intentional infliction of emotional distress and false light claim) ("[W]hatever the label, [plaintiff] cannot maintain a separate cause of action for mental and emotional distress where the gravamen is defamation"); *Readers Digest v. Superior Court*, 37 Cal.3d 244, 265, 208 Cal.Rptr. 137, 151 (Cal. 1984), *cert. denied*, 478 U.S. 1009 (1986) ("[L]liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication."); *Barker v. Huang*, 610 A.2d 1341, 1351 (Del. 1992) (agreeing with "great weight" of precedent nationally that independent action for emotional distress fails where "the gravamen of the complaint sounds in defamation"); *DeMeo v. Goodall*, 640 F. Supp. 1115 (D.N.H. 1986) (same result, under New Hampshire law); *Ramsay v. Mary Imogene Bassett Hospital*, 113 A.D.2d 149, 495, N.Y.S.2d 282 (N.Y.App. 1985) (rejecting on same grounds as defamation action, claims for negligence, interference with contract and infliction of emotional harm). *See also Galveston Newspapers, Inc. v. Norris*, 981 S.W.2d 797 (Tex.App. 1998) (holding Executive Director of Housing Authority could not maintain tortious interference with contract claim against newspaper, publisher and reporters who had published a series of articles on mismanagement and improper expenditures at authority, where there was no evidence of actual malice).

In addition to these First Amendment grounds – which alone mandate dismissal of Worrell-Payne's non-libel claims – Idaho State law vitiates each and every cause of action.

• false light: This tort requires, at a minimum, public disclosure of the same type of falsehood concerning the plaintiff as in libel. *Baker*, 99 Idaho at 691. "The interest protected is

---

reflecting "rudeness and bad taste," did not rise to the level of conduct necessary to state a claim for intentional infliction of emotional distress. *Koch*, 817 F.2d 507.

clearly that of reputation, with the same overtones of mental distress as in defamation." *Peterson*

*v. Idaho First National Bank*, 83 Idaho 578, 583, 367 P.2d 284 (1961). *See also Holbrook v.*

*Chase*, 12 Media L. Rep. 1732, 1733 (4th Dist., Idaho 1985) ("[s]ince the invasion of privacy-

false light claim arose out of the identical facts giving rise to the libel and slander claims, the

invasion of privacy claim was subject to the same defenses as the libel and slander counts").

Here, Worrell-Payne has failed to allege which statements are actionable under her false light

theory, let alone which of those statements she contends are false. *See* Def. Ex. 4 at ¶¶ 12, 16.

This alone warrants dismissal of this claim. Moreover, as the *Statesman* has demonstrated, all of

the articles and/or statements identified in Worrell-Payne's libel claim are true or substantially

true, which vitiates her false light claim as well. *See supra* §§ II.C.1 and II.D.1. Finally, false

light only will lie where "a reasonable man would be justified in the eyes of the community in

feeling seriously offended and aggrieved by the publicity." *Restatement (Second) of Torts* §

652(E), comment c. Here, it is <u>entirely unreasonable</u> for the chief executive of an agency

charged with administering tax dollars for the public good – which was under fire from

government investigations like this – to expect any less coverage than the *Statesman* afforded

her.

    • <u>emotional distress</u>: Worrell-Payne also alleges that the *Statesman*'s publication of

unspecified articles and/or editorials form the basis of her intentional infliction of emotional

distress claim. Def. Ex. 4 at ¶ 19. In Idaho, "In order to recover for the intentional infliction of

emotional distress the plaintiff must prove that the defendant's conduct was extreme and

outrageous which either intentionally or recklessly causes severe emotional distress." *Brown v.*

*Matthews Mortuary, Inc.*, 118 Idaho 830, 834, 801 P.2d 37 (1990). Idaho courts have long

acknowledged that "very extreme conduct" is required before an award of damages for the

intentional infliction of emotional distress can be made. *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 850, 606 P.2d 944 (1980). As a matter of law, the *Statesman*'s conduct in publicizing Worrell-Payne's performance of her official duties is not the type of "very extreme conduct" held actionable in Idaho, such as mutilating a corpse or placing a rat's carcass in a loaf of bread. (*See* examples cited in *Brown*, 118 Idaho at 835). The Court should disregard Worrell-Payne's bald allegations of emotional distress.

• tortious interference with contract: In order to establish a *prima facie* claim for tortious interference with contract, a plaintiff must prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 283-84, 824 P.2d 841, 858-59 (1991) (citing *Barlow v. International Harvester Co.*, 95 Idaho 881, 893, 522 P.2d 1102, 1114 (1974)). Worrell-Payne's contention that the *Statesman* interfered with her contract with the Housing Authority, Def. Ex. 11 at 7, is wholly unsupported. Indeed, the record compels the opposite conclusion, since the Housing Authority specifically represented that the media's coverage of Worrell-Payne was not the reason for her termination. Def. Ex. 64 at WP000264 ("claimant was not discharged for political reasons, nor was she discharged because of allegations in the media"). Accordingly, this claim also must be dismissed under state law.

• tortious interference with prospective economic advantage: Again, Worrell-Payne points to no specific *Statesman* articles and/or editorials as the basis of this cause of action. Def. Ex. 4 at ¶¶ 14, 17. In order to establish a *prima facie* claim for intentional interference with a prospective economic advantage, a plaintiff must prove that the intentional interference by the defendant, which caused injury, was wrongful by some measure beyond the fact of the

interference itself. *Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 178, 923 P.2d 416, 423 (1996) (citing *Idaho First Nat'l Bank*, 121 Idaho at 286, 824 P.2d at 861). Here, as this entire memorandum demonstrates, the *Statesman* committed no wrongful acts. Additionally, the only relationship Worrell-Payne has identified in conjunction with this claim is her employment with the New Brunswick (N.J.) Housing Authority. Def. Ex. 11 at 8. Even so, she fails to point to any evidence – as opposed to her own speculation -- that the *Statesman* in fact "interfered" with her work at that agency. This empty claim therefore must fail under state law – in addition to the First Amendment principles of *Hustler Magazine v. Falwell* and *Time, Inc. v. Hill.*

E.    ***Worrell-Payne has come forward with no evidence of any damages, and as a matter of law, she is not entitled to punitive damages.***

Worrell-Payne's claims all must be dismissed for her failure to prove any damages suffered as a direct and proximate result of the *Statesman*'s publications. Indeed, when pressed to explain what, if any, damages she has suffered as a result of the *Statesman's* actions, Worrell-Payne conclusively and without any evidence claims she "has suffered a loss of at least $100,000 in income and believes that she will suffer at least $250,000 loss of income in the future." Def. Ex. 11 at 8. Even so, Worrell-Payne admits that she has been employed in her "chosen field of work, *i.e.* public housing administration" ever since she was terminated from the Housing Authority (Def. Ex. 81 at 1).[23] And although the number of hours she works has been limited, she admits that restriction results -- not from the *Statesman*'s conduct – but by her unwillingness to move outside of the geographic area. Def. Ex. 11 at 7. She, therefore, has come forward with nothing on which the Court could base an award of actual damages.

---

[23]   To the extent that Worrell-Payne is claiming that the *Statesman* is responsible for her termination from the Housing Authority, this claim must be rejected, as it was by the Housing Authority. *See* Def. Ex. 64 at WP000264 ("Claimant was not discharged for political reasons, nor was she discharged because of allegations in the media") and WP000265-266 (list of performance-related reasons why Worrell-Payne was terminated).

Worrell-Payne also states an unsupported claim for punitive damages against the

*Statesman*: "Plaintiff also claims her compensatory damages for the actions of the *Statesman* to

be $1.75 million and seeks no less than $25 million in punitive damages." Def. Ex. 11 at 8. This

claim too must fail, for both procedural and substantive reasons.

First, Worrell-Payne did not properly move to amend her First Amended Complaint to

add a punitive damages claim. Idaho Code § 6-1604(2) provides:

> *In all civil actions in which punitive damages are permitted, no*
> *claim for damages shall be filed containing a prayer for relief*
> *seeking punitive damages.* However, a party may, pursuant to the
> pretrial motion and after a hearing before the court, amend the
> pleadings to include a prayer for relief seeking punitive damages.
> The court shall allow a motion to amend the pleadings if the
> moving party establishes at such hearing the reasonable likelihood
> of proving facts at trial sufficient to support an award of punitive
> damages (emphasis added).

This Court has specifically ruled that Idaho Code § 6-1604(2) is substantive state law that

controls state law actions like this one, filed in federal court. *See Doe v. Cutter Biological*, 844

F.Supp. 602, 609 (D.Idaho 1994); *Windsor v. Guaranty Trust Life Ins. Co.*, 684 F.Supp. 630

(D.Idaho 1988). Thus, Worrell-Payne's prayer for punitive damages violates Idaho Code § 6-

1604, and the Court must reject it as procedurally improper.

Second, in order to recover punitive damages on a defamation claim, Idaho Code § 6-712

requires timely notice to a publisher:

> Plaintiff shall serve upon the publisher, at the place of publication
> or broadcaster at the place of broadcast, a written notice specifying
> the statements and the manner in which said statements are
> claimed to be slanderous or libelous and demanding that the same
> be corrected. Said notice and demand must be served within
> twenty (20) days after knowledge of the publication or broadcast of
> the statement claimed to be slanderous or libelous.

Absent such a demand, "plaintiff shall recover no more than actual damages." Idaho Code § 6-

712. Moreover, even if no correction is published after a proper demand, plaintiff may not

recover punitive damages "unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice, and actual malice shall not be inferred or presumed from the publication or broadcast." *Id.* Here, Worrell-Payne did not ask for a retraction for each and every allegedly defamatory statement, as is required under Idaho Code § 6-712. *See* Material Facts at § II.O. Instead, Worrell-Payne submitted only two requests for retraction: one dated February 19, 1998, related to the *Statesman's* February 16, 1998 article (Def. Ex. 83)[24]; and one dated April 8, 1998, related to the *Statesman's* April 8, 1998 article (Def. Ex. 85). *See also* Def. Ex. 15 at 602:14-609:17. Neither of those requests even approaches the minimum requirements under Idaho law. Def. Exs. 84 and 86. Thus, Idaho Code § 6-712 is a complete bar to Worrell-Payne's ability to recover punitive damages on her defamation claims.

Third, the U.S. Supreme Court has held that under the First Amendment, where a publication encompasses matters of public concern, punitive damages may not be awarded against a media defendant absent a showing of actual malice. *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 479 (1985). All of the publications on which Worrell-Payne bases this action concern her performance of official duties, and, thus, touch on matters of public concern. *See* § III.C.i, *supra*. Moreover, as demonstrated in section III.A.iii, *supra*, there is simply no evidence in the record that the *Statesman* acted with actual malice. Thus, Worrell-Payne's punitive damages claim against the *Statesman* must fail.

## IV. CONCLUSION

Worrell-Payne's lawsuit is a classic example of why citizens depend on the courts to protect their First Amendment and common law rights to speak about the government. Under

---

[24] This retraction demand also purports to be a retraction demand for "the past two years' worth of articles about Ms. Worrell-Payne." Def. Ex. 83 at 2. Obviously, such a retraction demand is improper under Idaho Code § 6-712 (which requires that a demand: (1) specify "the statements and the manner in which said statements are claimed to be" defamatory, and (2) be served within 20 days of knowledge of the publication).

Worrell-Payne's view of the law, the press should not be permitted to report on allegations of mismanagement and abuse of office by public officials – even when addressed in official investigations – without laboring under the specter of protracted litigation. Fortunately, the court system, time and time again, has demonstrated its commitment to the "uninhibited, robust, and wide-open" discussion of public affairs in general, and the operations of government in particular. *New York Times*, 376 U.S. at 270.

In discovery, Worrell-Payne has been unable to uncover any evidence of actual malice by the *Statesman*, let alone the requisite "clear and convincing" evidence required in lawsuits by public officials/public figures against the press. Moreover, she has failed to show a substantially false statement of fact about her that appeared in the *Statesman*, and, instead, relies on vague implication and innuendo. Further, Worrell-Payne has shown no damages and did not comply with federal and state requirements for pleading and proving punitive damages. Finally, she impermissibly attempts to plead around the Constitution and Idaho law with causes of action that are barred entirely and do no apply to these facts.

For the foregoing reasons, as there is no genuine issue as to any material fact, the *Statesman* respectfully requests the entry of judgment as a matter of law in its favor on Worrell-Payne's First Amended Complaint.

DATED this 3ʳᵈ day of March, 2000.

Debora K. Kristensen
Jacqueline M. Fearnside
GIVENS PURSLEY LLP
Attorneys for Defendant Gannett Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2000, I caused to be served a true and correct copy of the foregoing by the method indicated below, and addressed to the following:

Donald W. Lojek
Lojek Law Offices
305 Fort Street
P.O. Box 1712
Boise, Idaho 83701

✓ U.S. Mail ____ Fax ____ By hand ____ Overnight